**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **C.G., a minor, by and through her parents, and next friends, P.G. and D.G.** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **No. 5:21-cv-03956** |
| **Saucon Valley School District** | : | |
| | : | **Jury Trial Demand** |
| **Defendant.** | : | |

**BRIEF IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Morris Scott (PA I.D. 83587)
Disability Rights Pennsylvania
1800 John F. Kennedy Boulevard
Suite 900
Philadelphia, PA 19103
215-238-8070
mscott@disabilityrightspa.org

## TABLE OF CITATIONS

### CASES

*Adams v. Freedom Forge Corp.*,
204 F.3d 475, 484 (3d Cir. 2000)....................17

*Baird v. 1600 Church Road Condominium Association*,
2017 WL 5570333, E.D. 2017 ....................33

*Berardelli v. Allied Servs. Inst. of Rehab. Med.*,
900 F.3d 104, 119 (3d Cir. 2018)....................28, 30, 36, 41

*Centennial Sch. Dist. v. Phil L. ex rel. Matthew L.*,
799 F. Supp. 2d 473, 483 (E.D. Pa. 2011)....................35

*Cf. Sak v. City of Aurelia*,
832 F. Supp. 2d 1026, 1048 (N.D. Iowa 2011) ....................41

*Chambers v. School District of Philadelphia*,
587 F.3d 176, 189 (3rd Cir. 2009). ....................35

*Cosgrove v. Bd. of Educ. of Niskayuna Cent. Sch. Dist.*,
175 F. Supp. 2d 375, 392–93 (N.D.N.Y. 2001)....................19

*Davila v. Pennsylvania*,
No. 3:11-CV-01092, 2016 WL 873237 (M.D. Pa. Jan. 20, 2016)..........26

*Deck v. City of Toledo*,
29 F. Supp. 2d 431, 434 (N.D. Ohio 1988) ....................39

*Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*,
501 F.2d 917, 919–20 (3d Cir. 1974)....................17

*Enyart v. Nat'l Conference of Bar Examiners, Inc.*,
630 F.3d 1153, 1167 (9th Cir.) ....................39

*Helen L. v. DiDario*,
46 F.3d 325, 332-33, 335 (3d Cir.), *cert. denied*, 516 U.S. 813 (1995).. ........................................................................................ 25, 36

*Issa v. Sch. Dist. of Lancaster*,
No. CV 16-3881, 2016 WL 4493202, (E.D. Pa. Aug. 26, 2016), *aff'd and remanded*, 847 F.3d 121 (3d Cir. 2017) ......................................... 18, 24

*John T. ex rel. Paul T. v. Com. of Pa.*,
No. 98-5781, 2000 WL 558582 (E.D. Pa. May 8, 2000) ........................ 19

*Karsevar v. Southland Corp.,*
*No. CIV.A. 87-672, 1987 WL 6693, (E.D. Pa. Feb. 12, 1987)* ............... 18

*KOS Pharmaceuticals, Inc. v. Andrx Corp*.,
369 F.3d 700, 708 (3rd Cir. 2004) .................................................... 18, 39

*L.R. ex rel. G.R. v. Steelton-Highspire Sch. Dist.*,
No. 1:10-CV-00468, 2010 WL 1433146, (M.D. Pa. Apr. 7, 2010) .......... 18

*Muhammad v. Court of Common Pleas of Allegheny County*,
483 F. App'x 759, 763 (3d Cir. 2012)..................................................26

*Petty v. Portofino Council of Coowners, Inc.*,
702 F. Supp. 2d 721, 731 (S.D. Tex. 2010)..........................................30

*Reilly v. City of Harrisburg*,
858 F.3d 173, 176 (3d Cir. 2017)............................................. 17, 23, 24

*Singer Mgmt. Consultants, Inc. v. Milgram*,
650 F.3d 223, 229 (3d Cir. 2011)........................................................24

*S.K. v. North Allegheny School Dist.,*
146 F. Supp. 3d 700, 714, 717-18 (W.D. Pa. 2015)………………………..26

*Temple Univ. v. White*,
941 F.2d 201, 219-20 (3d Cir. 1991),
cert. denied, 502 U.S. 1032 (1992)....................................................41

*Tennessee v. Lane*,
541 U.S. 509, 533 (2004)............................................................26

*United States v. Price*,
688 F.2d 204, 211-12 (3d Cir. 1982) ..................................................18

*University of Texas v. Camenisch*,
451 U.S. 390, 395, 101 S.Ct. 1830, 1834 (1981)..................................23

*Wisconsin Community Services, Inc. v. City of Milwaukee*,
465 F.3d 737, 751, 753 (7th Cir. 2006)................................................27

*Young v. Ohio*,
No. 1:12CV967, 2013 WL 146365, (S.D. Ohio Jan. 14, 2013)...............19

**STATUTES**

28 C.F.R. §35.104 ............................................................................16, 27
28 C.F.R. § 35.130(a) ............................................................................26
28 C.F.R. § 35.130(b)(7).......................................................................26, 36
28 C.F.R. § 35.136(a) ...........................................................................28, 37
28 C.F.R. § 35.136(f) ............................................................................31, 32
28 C.F.R. §§ 35.108(b)-(c).......................................................................25
28 C.F.R. §§ 35.130(b)(7)........................................................................29
28 C.F.R. §§ 36.302(a) ...........................................................................29
28 C.F.R. §35.136(b)(1)...........................................................................29
28 C.F.R. §35.136(b)(2)...........................................................................29
28 C.F.R. Pt. 35 .....................................................................................25
29 U.S. Code § 794(b)(2)(B).....................................................................35
29 U.S.C. § 794 ....................................................................................1, 2
29 U.S.C.A. §794 ...................................................................................34
42 U.S.C. § 12101(a)...............................................................................24
42 U.S.C. § 12101(a)(3)...........................................................................24
42 U.S.C. § 12102 ..................................................................................25

42 U.S.C. § 12131(1)(A) ........................................................................26
42 U.S.C. § 12131(2) ..............................................................................25
42 U.S.C. § 12132 ..................................................................... 1, 2, 24, 26
42 U.S.C. § 12134 ..................................................................................25
42 U.S.C. §§ 12102(1) .............................................................................25
42 U.S.C. §§ 12102(2) .............................................................................25

**OTHER AUTHORITIES**

SV Board Meeting 9-14-2021,
www.youtube.com/watch?v=7KRYiNHoP7k ..........................................38

H.R. Rep. No. 101-485, pt. 3, at 49 (1990),
*reprinted in* 1990 U.S.C.C.A.N. 267, 472 ................................................24

Merlin's Kids FAQ,
https://www.merlinskids.org/merlinskidsfaqs ..........................................6

Merlin's Kids Website,
https://www.merlinskids.org ........................................................................7

U.S. Department of Justice "Frequently Asked Questions about Service Animals and the ADA" Q4, 2010,
https://www.ada.gov/regs2010/service_animal_qa.html ........................33

U.S. Dep't of Justice, Civil Rights Div., Service Animals (July 12, 2011),
https://www.ada.gov/service_animals_2010.htm ...................................37

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................ 1

II. PROCEDURAL HISTORY OF THE CASE ........................................ 1

III. STATEMENT OF FACTS .............................................................. 2

A. Plaintiff C.G. is a Student With a Disability Who Obtained A Service Dog Recommended by her Physician…………………...2

B. C.G. Has a Service Dog That is Individually Trained To Do Work and Perform Tasks for Her Benefit……………………………6

C. The District Continued To Prohibit C.G. From Attending School With Her Service Animal………………………………………………9

D. The Districts Refusal To Allow C.G. To Attend School With Her Service Animal Is Causing Her Irreversible Harm………………...12

IV. STATEMENT OF THE QUESTION INVOLVED ................................ 14

V. SUMMARY OF ARGUMENT ........................................................ 15

VI. ARGUMENT ……………………………………………………………16

A. Standards for Issuance of a Preliminary Injunction……………….16

B. Irreparable Harm ……………………………………………………..18

C. C.G. is Likely to Succeed on The Merits of Her Case…………….23

a. The American With Disabilities Act (ADA)…………………..24

b. The District Has Denied C.G.'s Request For A reasonable Modification……………………………………….27

c. Section 504 of The Rehabilitation Act of 1973……………..34

D. There Will Be No Harm To Defendants If The Court Grants Plaintiff's Request for Injunctive Relief…………………….36

E. It Is In The Public Interest That C.G. Be Allowed to Attend School With Her Service Animal……………………………………….40

VII. BOND SHOULD NOT BE REQUIRED……………………………………..42

VIII. CONCLUSION…………………………………………………………………..42

## I. INTRODUCTION

Plaintiff C.G. is a 16-year-old student with multiple disabilities who is being improperly deprived of an education because Defendant Saucon Valley School District ("District") refuses to allow her to attend school accompanied by her service dog in violation of federal law. With the 2021-2022 school year well underway, C.G. is at home, unable to receive an education and participate in school activities with her peers.

Plaintiff seeks a preliminary injunction compelling the District to permit her to attend school with her service dog. The District's conduct is a clear violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and is causing irreparable academic, psychological and emotional harm to Plaintiff. The issuance of a preliminary injunction will cause no harm to Defendant and will serve the public interest. Accordingly, the Court should grant the requested relief ensuring that Defendant cannot continue to prohibit Plaintiff from attending school with her service animal until the merits of this action are fully adjudicated.

## II. PROCEDURAL HISTORY OF THE CASE

On September 3, 2021, Plaintiff filed a Civil Action Complaint (Doc.1), naming as Defendant, Saucon Valley School District, and asserting

disability discrimination under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Plaintiff also filed a Motion for Temporary Restraining Order ("TRO") (Doc. 3). On September 8, 2021, this Court denied Plaintiff's TRO on the ground that the granting of the same would disturb the status quo (Doc. 11).

## III. STATEMENT OF FACTS

### A. Plaintiff C.G. is a Student with a Disability Who Obtained a Service Dog As Recommended by her Physician

C.G. is a 16-year-old high school student with multiple disabilities, including Autism Spectrum Disorder, spastic diplegic cerebral palsy, intractable complex partial epilepsy, Attention Deficit Hyperactivity Disorder, Anxiety Disorder, Depression, chronic Migraines, Dyspraxia (Developmental Coordination Disorder), and Specific Learning Disabilities which have included Math Disorder, Disorder of Written Expression, and an Executive Function Disorder. Answer at ¶13 (Doc. 13). Plaintiff is also diagnosed with neurodevelopmental delays, post-traumatic stress disorder, dysgraphia, dyscalculia, food refusal enuresis, and right temporal lobe cortical dysplasia, and has a history of brain tumor. *See* Letter from LVPG Family Medicine, (June 29, 2020), at ¶1, attached as Exhibit 1. C.G. is in

the eleventh grade and is registered to attend Saucon Valley High School. Answer at ¶8.

C.G. has been diagnosed with epilepsy which causes her to have seizures. (LVPG Family Medicine Letter, at ¶1, Exh. 1). The seizures vary. Answer ¶20, and *see* Seizure Action Plan ("SAP")(Aug. 20, 2021), attached as Exhibit 2. The seizures may involve staring, confusion, incontinence, combativeness, verbal confusion, repetitive action/behaviors. (SAP, Exh. 2). C.G. previously had a lesionectomy on the right side of her brain in order to control her seizures, resulting in the removal of part of her brain. Answer at ¶ 14. However, the surgery was only partially successful. *See* P.G. Certification (Sept. 3, 2021), at ¶5, attached as Exhibit 3. C.G.'s epilepsy is intractable, which means that medications, which C.G. takes twice per day, are not fully effective in preventing her seizures.

C.G.'s seizures do not arise on a predictable schedule. *See* Letter from Boosara Ratanawongsa, M.D. (Sept. 13, 2021) at page 4, attached as Exhibit. 4. As emphasized by her treating neurologist, C.G. "continues to be at risk for seizures at any time." (Ratanawongsa Letter (Sept. 13, 2021), at page 2, Exh. 4). Answer at ¶¶ 18-19. Indeed, C.G. had two grand mal seizures, which resulted in a loss of consciousness and violent muscle contractions, including one at home on her first day back to school shortly

after her surgery. P.G Cert. (Sept. 3, 2021)at ¶ 6,Exh. 3. . C.G.'s most recent seizure was on January 12, 2020. (LVPG Family Medicine Letter (June 29, 2020), at ¶1, Exh. 1).

While there is no consistent pattern, stress is a primary seizure trigger for C.G. *See* letter from Boosara Ratanawongsa, M.D. (Aug. 25, 2021), at ¶2, attached as Exhibit 5. Moreover, C.G. experiences increased stress and anxiety because her seizures are so unpredictable, and this stress and anxiety make it more likely that she may have a seizure. (Ratanawongsa Letter (Aug. 25, 2021), at ¶2, Exh. 5).

Because a seizure is a serious medical event, C.G. must receive rescue medication and be taken to the hospital with every occurrence of a seizure. (SAP, Exh. 2). Defendant is well aware of C.G.'s seizures and resulting medical needs as she has a seizure plan, which is incorporated into her individualized education program ("IEP") and provides instructions on the administration of rescue medications, which are maintained by the school nurse and need for emergency services to be called. (P.G. Cert. at ¶¶ 8, 23, Exh. 3), *see* C.G. Individual Education Plan ("IEP") (Dec. 4, 2020), at pages 11, 16, attached as Exhibit 6, and Answer ¶¶ 20-23).

C.G.'s spastic diplegic cerebral palsy and dyspraxia have resulted in an uneven gait and poor stamina. (Ratanawongsa Letter (Sept. 13, 2021), at page 2, Exh. 4). In 2018, C.G. suffered a concussion at school during gym class. P.G. Cert. at, ¶9, Exh. 3. C.G.'s gait "has been impacted upon by post traumatic brain injury secondary to her concussion in 2018." (Ratanawongsa Letter (Sept. 13, 2021) at page 2, Exh. 4. C.G. has poor stamina and is in need of mobility support. (Ratanawongsa Letter (Sept. 13, 2021), at page 2, Exh. 4). C.G. is in vision therapy for her convergence and divergence disorder, "which preceded but was also worsened by her concussion." (Ratanawongsa Letter (Sept. 13, 2021), at page 2, Exh. 4). The concussion caused a permanent brain injury that impacts C.G.'s vision, for which she has received vision therapy. (P.G. Cert., at ¶9, Exh 3). C.G.'s doctor clearly documented as late as August 20, 2021, that C.G.'s type of "Visual Processing Disability does not reflect the eyes ability to receive the material. The problem lies in the fact that the brain does not know what to do with the information once it is received". *See* Neurosensory Center of Eastern Pennsylvania Accommodations Required form (Aug. 20, 2021) attached as Exhibit 7.

In 2016, even before the brain injury that C.G. suffered at school, C.G.'s doctor recommended that she obtain a service dog to assist her.

*See* GSPG Ancillary Prescription (April 7, 2016), attached as Exhibit 8. As a result, C.G.'s parents spent the next several years saving money, holding fundraisers, and soliciting donations on social media to raise $17,000, to obtain a trained service animal that would meet C.G.'s specific needs and help her learn to be more independent as she prepares to transition from high school to post-secondary education and adult life. (P.G. Cert at ¶12, Exh. 3). The total cost to train C.G.'s service animal was approximately $40,000. *Id*.

### B. C.G. has a Service Dog that is Individually Trained to do Work and Perform Tasks for Her Benefit

In February 2021, C.G. obtained a service dog, named George, from Merlin's Kids, a nonprofit organization that trains shelter dogs to be service animals. *See* Letter from J. Wolfe (Aug. 29, 2021), attached as Exhibit 9. Merlin's Kids has trained more than 1,000 service animals. *Id*., *See also* https://www.merlinskids.org/merlinskidsfaqs. Merlin's Kids trains dogs to perform specific tasks as needed by a particular person with a disability. *Id*., *See* https://www.merlinskids.org.

George is a multiple-task-trained medical service dog, who received more than 1,500 hours of training over 18 months and an additional nine months of public access exposure training. (Wolfe Letter (Aug. 29, 2021),

Exh. 9). George is individually trained to detect early signs of seizures and then to provide mitigation efforts to help prevent a seizure from occurring. *Id.* George is also trained to assist C.G. with mobility. *Id.* As explained by C.G.'s neurologist, Boosara Ratanawongsa, M.D.:

> George has been trained to help with seizure alerting, balance, safety/danger awareness (how best to cross the street safely), comforting her from the stand point of anxiety and when in pain. He provides deep pressure therapy. He can sense if she has nausea or seems lightheaded. When she has migraines, she can feel faint or lose balance. She has even had loss of vision. [C.G.] generally does not have the stamina to walk longer distances. With George, she has had more endurance to walk longer distances with less fatigue. He helps her with her balance when she is tired. He has also been able to sense when she is in pain.

(Ratanawongsa Letter (Sept. 13, 2021) at pages 1-2, Exh. 4). Dr. Ratanawongsa has concluded that "George has been a tremendous benefit to [C.G.] from the gross motor safety standpoint as well." *Id.* At page 2. Thus, George is not just *a* service dog. He is *C.G.'s* service dog.

George is trained to smell rising levels of cortisol, which is a stress hormone, on C.G.'s breath, to alert C.G. and those around her to her increasing anxiety, and to provide deep pressure therapy to help calm her in an effort to prevent a seizure. *Id.* Because of his training, George's

presence is reassuring to C.G. and itself helps calm her, which decreases the likelihood that she will have a seizure. *Id.*

C.G. and her parents completed training through Merlin's Kids, including a 12-week intensive personal service dog behavioral training course and more than 40 additional hours of hands-on training and public access. (Wolfe Letter (Aug. 29, 2021), Exh. 9. George's training has provided critical assistance to C.G. By way of recent example, on September 12, 2021, C.G. and her parents were shopping at a Home Depot when George detected that C.G. had become unstable and went into action. Consistent with his intensive training, George pushed C.G. against a sign in the store and helped her slump down against it so that if she fell backwards, she would not hit the back of her head on the floor. (Ratanwongsa Letter (Sep. 13, 2021), at page 2, Exh. 4). George then sat in C.G.'s lap to keep her from falling forward, alerted C.G.'s parents to the problem, and stayed there for approximately 40 minutes applying deep tissue therapy to help calm C.G. *Id*. After George successfully prevented a seizure, C.G.'s parents were able to move her back to the car and take her home. *Id*.

C.G.'s neurologist has stated in unmistakable language that C.G.'s service dog in medically necessary and has explained why:

> It is my professional opinion that it is medically necessary for [C.G.'s] service dog [to] be with her at all times including at school, so that she is able to attend school to progress both academically and social emotionally. Due to [C.G.'s] intractable complex partial epilepsy and the importance, as well as value, of an early alert provides her and others to institute safety measures and rescue medications in a timely manner, [C.G.] would benefit from having a trained seizure alert dog with her at all times even while at school. As noted in detail above, in addition to alerting [C.G.'s] family and any caregiver should [C.G.] present with a seizure, her service dog George benefits her in many ways from medical/safety to social emotional. Her service dog addresses her anxiety regarding having a seizure at any given point as they continue to be unpredictable. A service dog will provide [C.G.] with a layer of support for safety danger awareness due to her responses to actively having a seizure. [C.G.'s] anxiety is a related factor to having a seizure and not having the immediate support and safety with her. This is becoming more evident as she is of age where more independence is age appropriate. I am particularly concerned that the anxiety and depression related to not being able to have George with her has negatively impacted [C.G.'s] sleep and migraines and that all of these factors will further upset the balance we have recently achieved and could further lower her threshold for seizures.

Ratanawongsa Letter (Sept. 13, 2021) at page 4, Exh. 4.

### C. The District Continues to Prohibit C.G. From Attending School with Her Service Animal

In or about the Spring of 2021, P.G., C.G.'s mother, informed the District that C.G. had a service animal during C.G.'s IEP team meeting.

(P.G. Cert. at ¶14, Exh. 3). Then, again, on or about July 22, 2021, P.G. raised the use of C.G.'s service animal in school with school officials included on C.G.'s IEP team, who then met George. (P.G. Cert. at ¶¶15-17, Exh. 3). C.G. demonstrated to school officials that she was trained to handle George and the educational professionals praised C.G. for her handling of George. *Id.*; Answer at ¶36. P.G. also showed to school officials that as a trained service animal, George will use the bathroom properly when given the opportunity, but that C.G. would need to take George outside during her lunch period for that purpose. (P.G. Cert, at ¶17, Exh. 3); Answer at ¶37. A few days later, on July 27, 2021, P.G. received an email from the Supervisor of Special Education for the District, Colleen Mroz, stating that P.G. needed to provide certification that George could remain in the school building all day without needing to be taken outside to use the bathroom or needing to be fed. *See* Email from C. Mroz to P.G. (July 27, 2021), attached as Exhibit 10. The District also demanded "the certification for [C.G.] as his handler that is appropriate for necessary skills in a public school setting." (C. Mroz Email, Exh. 10). The District clearly stated that it was "looking forward to a fabulous year and are so happy to see [C.G.] back in school with George along her side!". *Id.*

In an effort to ensure that C.G. would be permitted to start school with her classmates and her service animal, on August 17, 2021, P.G. emailed Dr. Craig Butler, superintendent of the District, noting that C.G. has a disability, providing a description of where George was trained, describing the tasks George is trained to perform, providing a copy of George's vaccination records, and otherwise provided Defendant with ample information supporting George's purpose, necessity and training. *See* Email from P.G. to C. Butler (Aug. 17, 2021), attached as Exhibit 11. On August 18, 2021, P.G. emailed Colleen Mroz, Supervisor of Special Education at the District, an explanation of the tasks George is trained to perform and the beneficial effect he has had upon C.G. *See* Email from P.G. to C. Mroz (Aug. 18, 2021), attached as Exhibit 12. This email describes George's training to detect rising cortisol levels and the detection of behaviors in C.G. that may indicate a seizure. *Id*.

On August 20, 2021, P.G. spoke to Dr. Butler and requested that the District allow C.G. to attend school with her service animal. (P.G. Cert., at ¶22, Exh. 3; Answer at ¶43). Dr. Butler told P.G. that someone would contact her before school started on August 23, 2021, but no one from the District did so. (P.G. Cert. ¶¶ 22, 29, Exh. 3, and Answer at ¶43).

Continued efforts to resolve this matter on behalf of C.G. without court intervention through her counsel during the week of August 23, 2021, were also unsuccessful. *See* Certification of Lee Wentz (Sep. 2, 2021), at ¶¶7-11, attached as Exhibit 13.

On August 30, 2021, P.G. again provided, via email, detailed information to the District about C.G.'s disabilities, George's training, and C.G.'s need for George to attend classes with her. (Complaint ¶ 46, and Answer ¶ 4, and P.G. Cert., at, ¶¶ 23-28, Exh. 3). This communication included a letter from C.G.'s psychiatrist's office recommending that C.G. be allowed to attend school with her service animal, a letter from C.G.'s neurologist to the same effect, and a letter from Merlin's Kids detailing George's extensive training and the tasks he is trained to perform. (P.G. Cert. at ¶25, Exh. 3, Complaint at ¶46, Answer at ¶46).

At no time since the 2021-2022 school year began has the District permitted C.G. to attend school with her service animal. Answer at ¶3.

### D. The District's Refusal to Allow C.G. to Attend School With <u>Her Service Animal is Causing Her Irreversible Harm</u>

As a result of the District's refusal to allow C.G. to attend school with her service animal, C.G. has been unable to access and benefit from in-person full-time educational instruction to the same extent as her peers

who have no disability. She is instead being offered only a total of five hours per week of remote homebound instruction coupled with changes to her existing schedule to accommodate the District's staffing for homebound instruction. September 16, 2021, Team Meeting with District. C.G.'s individualized education program is not being implemented and her education has been severely truncated.

Moreover, as a result of her exclusion from school with her service animal, C.G. has experienced more severe migraine headaches, more stress, more anxiety, and more insomnia. (Ratanawongsa Letter (Sep. 13, 2021) at page 1, Exh. 4). According to her neurologist, Boosara Ratanawongsa, M.D., C.G. has been:

> experiencing an increased amount of severe headaches and migraines. Migraines previously had been managed early on with medication, fluid and rest. We had worked out an effective headache abortive regimen. However, with recent stressors associated with not being able to be in school with her disability service dog, headaches have transformed to a chronic daily headache. There has been an increase in her migraines since the whole situation occurred. Stress has been high.

(Ratanawongsa Letter (Sept. 13, 2021) at page 1, Exh. 4). Dr. Ratanawongsa also noted that C.G.'s sleep has been greatly disturbed during this stressful period of time. *Id.* As it relates to C.G.'s anxiety, Dr. Ratanawongsa stated that C.G.:

> had been doing well on just fluoxetine alone without counseling for some time until recently. With the concern that she may not be able to attend school with George, her general mood has decreased, and she is not engaging in activities with interest as before. She is having increased anxiety/panic attacks as well and has required alprazolam more than usual.

*Id.* at page 2, ¶2. As explained by Dr. Ratanawongsa: "Over time it has become more clear how much anxiety about possibly having a seizure has impacted her. It has been very traumatic for her." *Id.*

C.G.'s neurologist conducted a neurological follow-up examination on September 13, 2021 (the day after the Home Depot event) and concluded that the increase in C.G.'s migraines is directly related to the Defendant's refusal to allow her to attend school with her service animal. (Ratanawongsa Letter (Sept 13, 2021) at page 1, ¶1 and page 2, ¶2, Exh. 4). C.G. has also experienced increased insomnia and because of the District's ongoing actions regarding George. *Id.* (Ratanawongsa Letter (Sep. 13, 2021), at page 1, ¶1, and at page 4 ¶4, Exh. 4).

## IV. <u>STATEMENT OF THE QUESTIONS INVOLVED</u>

1. Whether Plaintiff has a legal right under Title II of the ADA and Sec 504 of the Rehabilitation Act to have her service animal accompany her to school.

*Suggested Answer: Yes.*

2. Whether the Court should issue a preliminary injunction enjoining Defendant from prohibiting the attendance of Plaintiff at school with her service animal.

   *Suggested Answer: Yes.*

## V. <u>SUMMARY OF THE ARGUMENT</u>

Defendant's refusal to permit Plaintiff, who has a disability, to attend school with her service animal is inflicting irreparable harm upon Plaintiff because it is medically unsafe for Plaintiff to appear at school without her service animal, forcing Plaintiff to be without proper secondary educational instruction to which she is entitled. Plaintiff is forced to choose between absence from school and danger at school. Plaintiff is forced to endure segregated sub-standard instruction while other students enjoy the value and benefits of open face to face classroom interaction. This harm cannot be compensated by money.

Plaintiff is likely to succeed on the merits of her action under Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973 (Section 504). Defendant has violated the ADA because Plaintiff is a qualified individual with a disability (Answer at ¶ 51), and Defendant is a public entity (Answer at¶ 54) which has refused to make

a reasonable accommodation to allow the service animal to accompany Plaintiff to school. Defendant has violated Section 504 because (a) it receives federal funding (Answer at¶60), (b) Plaintiff has a disability (Answer at¶ 59), (c) Plaintiff was otherwise qualified to participate in school activities (*Id.*); and (d) Plaintiff is being denied the benefit of school activities because of Defendant's refusal to permit Plaintiff's service animal to accompany her. Plaintiff's service animal qualifies as a reasonable accommodation based upon the definition of a service animal in 28 C.F.R. §35.104.

Defendant would suffer no significant harm if Plaintiff's Motion were granted since the service animal (a) is not out of control (P.G. Cert., at ¶16, Exh. 3, and Wolfe Letter (Aug. 29, 2021, Exh. 9), (b) is trained (*Id.*), (c) would not alter the nature of Defendant's educational program, and (d) causes no threat to the health of safety of any individual. The granting of Plaintiff's Motion is in the public interest because it is consistent with the legislative intent of the ADA and Section 504, the Department of Justice (DOJ) regulations, and the DOJ's legal actions enforcing the right of a person with a disability to be admitted to a public entity with their service animal.

## VI. <u>ARGUMENT</u>

### A. STANDARDS FOR ISSUANCE OF A <u>PRELIMINARY INJUNCTION</u>

To be granted injunctive relief, a plaintiff must show: (1) that she is likely to experience irreparable harm without an injunction, and (2) that she is reasonably likely to succeed on the merits. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000). "[In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017) *citing Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974) (citations omitted). If a plaintiff's motion requests "mandatory preliminary injunctive relief", compelling a defendant to take affirmative action, the plaintiff's motion may be granted where "the exigencies of the situation demand such relief," notwithstanding the alteration of the status quo. *Karsevar v. Southland Corp., No. CIV.A. 87-672, 1987 WL 6693, at *4 (E.D. Pa. Feb. 12, 1987)*. The "status quo" is the "last, peaceable, noncontested status of the parties." *KOS Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3rd Cir. 2004). "A court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in the particular case" … including the power to

issue a mandatory injunction when the status quo is exactly what will inflict the irreparable injury. *United States v. Price*, 688 F.2d 204, 211-12 (3d Cir. 1982). The facts of this case, and the federal rights which are at stake, weigh in favor of the Court issuing a preliminary injunction.

## B. IRREPARABLE HARM

Irreparable harm exists where a movant "will experience harm that cannot adequately be compensated after the fact by monetary damages". *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000). The deprivation of an educational right, such as denying a student access to her school, or access to the same education as other students, is an irreparable harm suitable to be addressed with injunctive relief. *See Issa v. Sch. Dist. of Lancaster*, No. CV 16-3881, 2016 WL 4493202, at *7 (E.D. Pa. Aug. 26, 2016), *aff'd and remanded*, 847 F.3d 121 (3d Cir. 2017) (the court granted a mandatory injunction ordering school district to enroll students)(unpublished); *L.R. ex rel. G.R. v. Steelton-Highspire Sch. Dist.*, No. 1:10-CV-00468, 2010 WL 1433146, at *3-4 (M.D. Pa. Apr. 7, 2010) (granting mandatory preliminary injunction for a homeless student being denied access to his "school of origin.") (unpublished); *Cosgrove v. Bd. of Educ. of Niskayuna Cent. Sch. Dist.*, 175 F. Supp. 2d 375, 392–93 (N.D.N.Y. 2001) (granting mandatory preliminary injunction stating "It is

almost beyond dispute that wrongful discontinuation of a special education program to which a student is entitled subjects that student to actual irreparable harm") (unpublished); *Young v. Ohio*, No. 1:12CV967, 2013 WL 146365, at *9 (S.D. Ohio Jan. 14, 2013) (granting mandatory preliminary injunction in IDEA case and discussing collected cases that have done the same). "Compensation in money can never atone for deprivation of a meaningful education in an appropriate manner at the appropriate time." *John T. ex rel. Paul T. v. Com. of Pa.*, No. 98-5781, 2000 WL 558582, at *8 (E.D. Pa. May 8, 2000) (unpublished). The District's denial of a reasonable accommodation to C.G. is denying her an adequate education.

C.G. requires 24-hour direct supervision by an adult (LVPG Family Medicine Letter (June 29, 2020), Exh. 1). Because of her disabilities, in 2016 C.G.'s doctor recommended a service dog to address her disability needs. (GSPG Ancillary Prescription (April 7, 2016), Exh. 8). C.G.'s parents spent the next several years saving money, holding fundraisers, and soliciting donations on social media to raise $17,000 to cover their portion of the $40,000 cost to have George trained (P.G. Cert. at ¶12, Exh. 3), which itself took 18 months. George came home with C.G. in February 2021, while the District's classes were being held remotely due to Covid-

19. Now that in-person classes have resumed in the fall of 2021, and C.G. has her trained service dog, she is entitled to his services at school. George helps to prevent and mitigate C.G.'s seizures by detecting C.G.'s rising cortisol levels, helping to reduce her stress levels, so that a seizure is not triggered. He is thus trained to detect the onset of a seizure, and to provide help to mitigate the effects of the seizure if one does occur. The possibility of a seizure is not a far-fetched presumption since (a) C.G.'s most recent seizure was on January 12, 2020. (LVPG Family Medicine Letter, (June 29, 2020), Exh. 1); (b) C.G. "continues to be at risk for seizures at any time." (Ratanawongsa Letter (Sep. 13, 2021) at page 2, ¶3, Exh. 4, Complaint at ¶¶ 18-19, Answer at ¶¶ 18-19), and (c) C.G.'s seizures do not arise on a predictable schedule. (Ratanawongsa Letter (Aug. 25, 2021) at ¶2, Exh. 5; Ratanawongsa Letter (Sep.13, 2021) at page 2, ¶3, Exh. 4).

In 2018, C.G. suffered a concussion at school during gym class. (P.G. Cert. at ¶9, Exh. 3; LVPG Family Medicine Letter, ¶1, Exh. 1). The concussion caused a permanent post-traumatic brain injury that causes vision problems, for which C.G. receives vision therapy. (Neurosensory Center of Eastern Pennsylvania Accommodations Required form (Aug. 20, 2021), Exh. 7), Ratanawongsa Letter (Sep. 13, 2021), at Page 2, ¶4, Exh.

4). Her vision problems make it difficult for C.G.'s brain to process what C.G. is seeing. *Id.* As a result, C.G. is in need of mobility safety and support, due to her poor stamina, which renders her unable to perform such tasks as safely crossing the street without assistance. (Ratanawongsa Letter (Sep. 13, 2021), at page 2, ¶4, Exh. 4; LVPG Family Medicine Letter, at page 1, ¶1, Exh. 1). George assists C.G. as he is trained in mobility assistance and support. (J. Wolfe Letter (Aug. 29, 2021) (Exh. 9); Ratanawongsa Letter (Sep. 13, 2021), at page 2, ¶4, Exh. 4). This eliminates the need for C.G. to depend on others to help her safely walk through the school building. As recently as September 12, 2021, C.G. required the assistance of George at a Home Depot when she became ill. George, as trained, nudged C.G. against some signage, got into the floor to prevent her from falling, alerted her parents to the problem, and stayed with her applying therapy for forty minutes until she was stable. (Ratanawongsa Letter (Sep. 13, 2021), at page 2, ¶ 1, Exh. 4). These are the actions of a service animal, not an emotional support animal. It is also worth noting that Home Depot recognized its ADA obligations and allowed C.G. into the store with George.

As Defendant continues to deny C.G. the use of George at school, C.G. will continue to experience irreparable harm because, without George,

she is being denied her right to fully participate in school and enjoy the benefits of Defendant's program. Although, efforts are underway to provide homebound instruction during the course of this litigation, the homebound instruction will be limited to five hours per week. The absence from school, and lack of any educational instruction equal to that which other students receive, is having and will continue to have a detrimental and irreversible effect upon C.G.'s health and wellbeing, and upon her intended progress toward graduation from high school and advancement to post-secondary education. She is, furthermore, effectively being segregated from her peers and denied an adequate education without the use of her service animal at school.

The District initially welcomed George and was impressed by him and C.G.'s handling of him, stating that it was looking forward to seeing C.G. along with George at school. (C. Mroz Email, Exh. 10). The District's sudden refusal to permit George to accompany C.G. to school has caused a significant increase in C.G.'s anxiety levels and increased her likelihood of having a seizure. (Ratanawongsa Letter (Sep. 13, 2021), at page 2, ¶1, Exh. 4; Ratanawongsa, Letter (Aug. 25, 2021) at ¶ 2, Exh. 5). Yet now, the Defendant is denying that he is even a service animal. This has caused C.G. immense emotional and psychological stress necessitating more

medications in an effort to keep her mental health from spiraling out of control. Ironically enough, the District's actions have caused a negative-feedback loop that has actually increased C.G.'s need for her service animal because the additional stress makes it more likely that C.G. will have a seizure. Denying C.G. the reasonable accommodation of her service animal is denying her a right to which she is entitled and is, itself, causing irreparable harm. Consequently, C.G. is missing important and critical time at school for which money cannot compensate. She is being irreparably harmed.

### C. C.G. Is Likely to Succeed on the Merits of Her Case

C.G. will likely succeed on the merits of her case. To demonstrate that she can succeed on the merits, Plaintiff needs to show a significantly better than negligible, but not necessarily more likely than not, likelihood of success. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017). Preliminary injunctions are "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"; and a "party is not required to provide his case in full at a preliminary injunction hearing." *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834 (1981). The Third Circuit does not require, at the preliminary stage, "a more-

likely-than-not showing of success on the merits because a 'likelihood' [of success on the merits] does not mean more likely than not." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179, fn.3 (3d Cir. 2017), *as amended* (June 26, 2017) *quoting Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc). Plaintiff is neither required to prove her case "wholly without doubt" nor to a "certainty." *Issa v. The School District of Lancaster*, 847 F.3d 121, 131 (3rd Cir. 2017). Plaintiff need only prove a "prima facie case". *Id.*

**a. <u>The Americans with Disabilities Act</u>**

Congress enacted the Americans with Disabilities Act (ADA) in 1990 to prohibit discrimination by, inter alia, all "public entities" regardless of whether they receive federal funding. H.R. Rep. No. 101-485, pt. 3, at 49 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 472. The ADA reflects Congress' recognition of the pervasiveness of disability-based discrimination in society. 42 U.S.C. § 12101(a). Congress specifically found that "discrimination against individuals with disabilities persists in such critical areas as … education[.]" 42 U.S.C. § 12101(a)(3) (ADA).

Title II of the ADA broadly provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of the

public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. The contours of Title II's anti-discrimination mandate have been further delineated by regulations promulgated by the Department of Justice ("DOJ"), 28 C.F.R. Pt. 35, pursuant to Congressional direction, 42 U.S.C. § 12134, which the Third Circuit has held have the "force of law." *Helen L. v. DiDario*, 46 F.3d 325, 332-33, 335 (3d Cir.), *cert. denied*, 516 U.S. 813 (1995).

C.G has a disability protected by the ADA. The ADA defines "disability" to include physical impairments that substantially limit major life activity and major bodily functions. 42 U.S.C. §§ 12102(1), 12102(2). As described above, C.G. plainly has physical and psychological impairments that substantially limit her ability to learn, socialize, walk, and care for herself, all of which are major life activities. These physical and psychological impairments are well documented by her physician. As such, she is a person with a disability protected by the ADA. *See* 42 U.S.C. § 12102; 28 C.F.R. §§ 35.108(b)-(c). C.G. is "qualified" because, as a student enrolled in the Saucon Valley School District, she meets the essential eligibility requirements for receipt of the District's services and participation in its programs and activities, with or without reasonable modifications. 42 U.S.C. § 12131(2). There is also no dispute that Defendant, a public

school district, is a public entity required to comply with Title II of the ADA. 42 U.S.C. § 12131(1)(A).

There are several ways in which a plaintiff can establish liability under Title II of the ADA. A qualified person with a disability can prevail under Title II by showing that she has either been excluded from, or denied, the benefits of the public entity's services, programs, or activities. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a); *Davila v. Pennsylvania*, No. 3:11-CV-01092, 2016 WL 873237, at *5 (M.D. Pa. Jan. 20, 2016), *report and recommendation adopted*, 2016 WL 861884 (M.D. Pa. Mar. 7, 2016), *app. dismissed*, No. 16-1657 (3d Cir. Oct. 13, 2016). A qualified person with a disability also can prevail by establishing that the public entity refused to make a reasonable modification (sometimes called a reasonable accommodation) in its policies, practices, and procedures that is necessary to avoid disability discrimination. 28 C.F.R. § 35.130(b)(7). The ADA's reasonable modification requirement imposes an "affirmative obligation" on public entities. *Tennessee v. Lane*, 541 U.S. 509, 533 (2004); *S.K. v. North Allegheny School Dist.*, 146 F. Supp. 3d 700, 714, 717-18 (W.D. Pa. 2015). A failure to make reasonable modifications or accommodations is an independent basis for liability under Title II of the ADA. *Muhammad v. Court of Common Pleas of Allegheny County*, 483 F. App'x 759, 763 (3d Cir. 2012); *accord*

*Wisconsin Community Services, Inc. v. City of Milwaukee*, 465 F.3d 737, 751, 753 (7th Cir. 2006) (en banc). For purposes of this Motion, Plaintiff focuses on her claim that Defendant violated Title II's reasonable modification mandate.

**b. The District Has Denied C.G.'s Request for a Reasonable Modification**

The DOJ has promulgated detailed regulations governing public entities' obligation to permit the use of a service animal by an individual with a disability. The regulations define a service animal as

> any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability… Examples of work or tasks include, but are not limited to, … assisting an individual during a seizure … [and] providing physical support and assistance with balance and stability to individuals with mobility disabilities. 28 C.F.R. § 35.104.

Plaintiff has provided numerous letters from C.G.'s physicians documenting C.G.'s psychiatric, mental, sensory and physical disabilities and their propensity to cause a seizure or other injury. (LVPG Family Medicine Letter (June 29, 2020), Exh.1); Ratanawongsa Letter (Sep. 13, 2021), Exh. 4, Ratanawongsa Letter (Aug. 25, 2021), Exh. 5, and *see* Letter from A. Pulcini, PA-C, (Aug. 24, 2021), attached as Exhibit 14). Despite Defendant's attempt to contest the legitimacy of C.G.'s

disabilities relating to mobility, the September 13, 2021, letter clearly documents issues relating to "stamina to walk longer distances", fatigue, balance, pain, gross motor safety, "mobility support", vision therapy. Moreover, C.G.'s doctor clearly documented as late as August 20, 2021, that C.G.'s type of "Visual Processing Disability…does not reflect the eyes ability to receive the material. The problem lies in the fact that the brain does not know what to do with the information once it is received". (Neurosensory Center of Eastern Pennsylvania Accommodation Required form (Aug. 20, 2021), Exh. 7). Against Plaintiff's numerous letters from C.G.'s doctors, the letter certifying George as a service animal, and the DOJ regulations defining a service animal, Defendant offers no professional documentation or evidence to rebut Plaintiff's claims, except for Defendant's lay opinion and surmised legal arguments.

"Generally, a public entity shall modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability." 28 C.F.R. § 35.136(a); *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 119 (3d Cir. 2018) (listing all four exceptions). The only exceptions to this general rule are (1) if an animal is "out of control and the animal's handler does not take effective action

to control it," 28 C.F.R. §35.136(b)(1).(2) animals that are not housebroken, 28 C.F.R. §35.136(b)(2). (3) if granting access with the service animal would "fundamentally alter" the nature of the program, 28 C.F.R. §§ 35.130(b)(7), 36.302(a). or (4) if the animal poses a "direct threat" to the health or safety of others. *Id*. §§ 35.139, 36.208. None of these exceptions apply in this case. The letter certifying George's training indicates that he has undergone at least 1500 hours of training. (J. Wolfe Letter (Aug. 29, 2021), Exh. 9). Moreover, when C.G.'s IEP team met George they were impressed by him and by C.G.'s ability to handle him. (P.G. Cert. at ¶16, Exh 3). Furthermore, by C.G. not been allowed to attend school with George, there is no evidence of George being out of control. George poses no "direct threat". Therefore, neither exception (1) nor (4) apply in this case. Moreover, George is housebroken and trained to relieve himself quickly when given an opportunity. Consequently, exception (2) does not apply. Finally, granting C.G. access to her school would not fundamentally alter the nature of the District's program. The District's "program" is to provide education to all its students including those with disabilities. The Third Circuit caselaw has recognized that allowing a student to use a service animal is an accommodation that schools must provide. *Berardelli v. Allied Servs. Inst. of Rehab. Med.*,

900 F.3d 104, 119 (3d Cir. 2018). "[I]f the exceptions are inapplicable, a disabled individual's proposed accommodation of the use of her service animal is reasonable under the ADA as a matter of law." *Id*. Therefore, by denying C.G. access to her school with her service animal, the Defendant is denying C.G.'s request for a reasonable accommodation.

Furthermore, by imposing the restriction that George cannot use the bathroom during the school day, Defendant has unreasonable restricted C.G.'s use of George as a service animal and denied her a reasonable accommodation. *See Petty v. Portofino Council of Coowners, Inc.*, 702 F. Supp. 2d 721, 731 (S.D. Tex. 2010) (motion to dismiss denied where homeowners association prohibited a service dog user's brother from taking the service dog out of the building to use the bathroom. "By steering the service animal away from the common areas outside the building, Defendant has made the condominium complex unavailable and has failed to provide reasonable accommodations."). It would affect no substantial alteration of the District's program for the District to simply allow C.G. to take George to a corner of the school yard during her lunch period so that he can quickly use the bathroom and go back to work.

The Defendant has also requested documentation and certification for George in violation of the ADA's service dog regulations.

> A public entity … may make two inquiries to determine whether an animal qualifies as a service animal. A public entity may ask if the animal is required because of a disability and what work or task the animal has been trained to perform. A public entity shall not require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal. 28 C.F.R. § 35.136(f).

In this case, Defendant has not only requested certification for George, but also certification that he can go all day without using the bathroom. (C. Mroz Email, Exh. 10). This is not permissible under the ADA's service dog regulations. Nonetheless, despite Defendant's overreaching inquiries and requirements, C.G.'s parents, in good faith, provided ample documentation pertaining to George. (Email from P.G. to C. Butler (Aug. 17, 2021), Exh.11; Email from P.G. to C. Mroz (Aug. 18, 2021), Exh.12). Yet Defendant has continued to prohibit C.G. from having her service animal accompany her to school.

Defendant, in its filed Responses, continues to pursue inquiries well beyond the two permitted questions in 28 C.F.R. § 35.136(f). Defendant, without any expertise or basis, attempts to claim that George is not a service animal, that George exists just for C.G.'s emotional support, and that somehow, C.G. does not suffer from any disability that requires George. Defendant's position amounts to a claim that, despite years of

fundraising to acquire their $17,000.00 portion to purchase a $40,000.00 professionally trained dog, which comes with certification as a service dog, that Plaintiff somehow has endured and sacrificed such a significant and substantial amount of time, money and effort, to obtain a dog for mere emotional comfort. In contrast to Defendant's lay opinion, Plaintiff has produced a plethora of documentation from professionals showing that C.G. has disabilities, that George is a service animal, and that George is trained to address C.G.'s disabilities. Such documentation includes letters from C.G.'s doctors detailing C.G.'s medical condition and need for George, a letter from George's training institution detailing George's training and status as a service animal, and other such correspondence. This documentation of C.G.'s disability and George's training goes well beyond satisfying the requirements set forth in Defendant's own cited case, *Baird v. 1600 Church Road Condominium Association*, 2017 WL 5570333, E.D. 2017. Moreover, despite Defendant's heavy reliance on the holding in the *Baird* case, that case is distinguishable for many reasons. The Americans with Disabilities Act was not applicable to that case since it concerned a private condominium, unlike this case which concerns a public entity providing public service. That case concerned an individual with a history of having panic attacks,

but this case concerns an individual with many more disabilities including epilepsy, seizure, vision and mobility issues, and a history of a concussion at the same school district. The *Baird* case, moreover, contained no documentation of any training of the subject animal, or that it was even called a service animal.

Moreover, the Department of Justice regulations clearly state that "The ADA makes a distinction between psychiatric service animals and emotional support animals. If the dog has been trained to sense that an anxiety attack is about to happen and take a specific action to help avoid the attack or lessen its impact, that would qualify as a service animal. However, if the dog's mere presence provides comfort, that would not be considered a service animal under the ADA". (U.S. Department of Justice "Frequently Asked Questions about Service Animals and the ADA" Q4, 2010, https://www.ada.gov/regs2010/service_animal_qa.html). Plaintiff's numerous documentation from C.G.'s doctors and certification from George's trainer, shows that George is specifically trained to sense C.G.'s anxiety attacks and avoid or lessen its impact. This is of immediate importance in light of the most recent seizure in 2020. (LVPG Family Medicine Letter (June 29, 2020), Exh.1).

In summary, C.G.'s request to use her service animal is reasonable. Defendant has denied C.G.'s reasonable request. Defendant, therefore, has violated the ADA and its regulations governing service animals. Plaintiff has shown far more than a likelihood of succeeding on the merits of her claim.

**c. <u>Section 504 of the Rehabilitation Act of 1973</u>**

Section 504 of the Rehabilitation Act ("§504") provides that: "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C.A. §794.

To prevail on a claim alleging a violation of §504, C.G. must show that the Defendant receives Federal funding and show further that she (1) has a disability; (2) was otherwise qualified to participate in the program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of a disability. *Chambers v. School District of Philadelphia*, 587 F.3d 176, 189 (3rd Cir. 2009).

As a publicly funded school district, the District receives federal funding. (Answer at ¶60). The definition of a person with a disability in §

504 is, moreover, the same as the definition of person with a disability in the ADA. *Centennial Sch. Dist. v. Phil L. ex rel. Matthew L.*, 799 F. Supp. 2d 473, 483 (E.D. Pa. 2011). Thus, for the reasons set forth above in the context of the ADA, C.G. is a person with a disability entitled to the protections of §504. (Answer at ¶59). C.G. is otherwise qualified to participate in the District's "program" by attending school at her local high school. 29 U.S. Code § 794(b)(2)(B) defines a "program or activity" to specifically include local educational agencies. C.G. is enrolled in the District as a student with an IEP from the District.

C.G. is being denied the benefits of the District's program and activities and otherwise discriminated against because of her disability. Both the ADA and §504 require "reasonable modifications" to policies, practices, or procedures

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7); *Helen L. v. DiDario*, 46 F.3d 325, 337 (3d Cir. 1995) (internal citations omitted).

In *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, the Third Circuit squarely held that the ADA's service dog regulations are equally

applicable to an analysis of a service dog as a reasonable accommodation under §504.

> [T]he service animal regulations, although technically interpreting the ADA, are no less relevant to the interpretation of the RA. In the latter context too, the general rule—subject to the same exceptions—is that a grantee must "modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability," 28 C.F.R. § 36.302(c)(1), and must "permit[ ] [such individuals] to be accompanied by their service animals in all areas of [the grantee's facilities] where ... program participants ... are allowed to go," id. § 36.302(c)(7). And just as in the ADA context, where no exception applies, the accommodation of such individuals' use of service animals is per se reasonable. *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 120 (3d Cir. 2018) (citations omitted)

Therefore, as with the ADA, because the District is denying C.G. the use of her service animal, it is denying her a reasonable accommodation under §504 and discriminating against her because of her disability. C.G. has shown a likelihood that she will succeed in proving her claim of discrimination under §504.

**D. There Will Be No Harm to the Defendants If the Court Grants Plaintiff's Request for Injunctive Relief**

If Plaintiffs' injunctive relief is granted, there will be no harm to Defendant. Defendant will suffer no risk of loss if C.G. attends classes. In-person classes have resumed in the District, and staff and students

are in classes at Saucon Valley High School. It would cost Defendant nothing if C.G. were also attending classes with George.

As set forth above, there are only four exceptions that allow a public entity to deny the use of a service animal, and none of these exceptions apply. Absent an exception, "a public entity shall modify its policies, practices or procedures to permit the use of a service animal by an individual with a disability." 28 CFR § 35.136(a). As documented in this case, C.G.'s service animal is professionally trained, fully housebroken, and under the control of its handler. Therefore, there is no potential harm to Defendant.

Other concerns and distractions such as "allergies and fear of dogs" are not valid reasons for denying access or refusing service to people using service animals. U.S. Dep't of Justice, Civil Rights Div., Service Animals (July 12, 2011), https://www.ada.gov/service_animals_2010.htm. When a person who is allergic to dog dander, and a person who uses a service animal must spend time in the same room or facility, for example, in a school classroom … they both should be accommodated by assigning them, if possible, to different locations within the room or different rooms in the

facility." U.S. Dep't of Justice, Civil Rights Div., Service Animals (July 12, 2011), https://www.ada.gov/service_animals_2010.htm.

The absence of harm to Defendant is further demonstrated by Defendant's representation to the Court, through counsel, at the hearing for Plaintiff's Motion for Temporary Restraining Order, that if George is found to be a service animal, Defendant would allow George to accompany C.G. to school. This shows that the mere presence of George at school with Plaintiff would cause no harm. Moreover, at the last publicly recorded School District board meeting, a board member requested an update on this matter stating: "I thought that Saucon Valley honors medical needs" ("SV Board Meeting 9-14-2021", www.youtube.com/watch?v=7KRYiNHoP7k, which is, at a minimum, an indication that the presence of George with C.G. will not cause harm to Defendant.

The Court's Order denying Plaintiff's Motion for Temporary Restraining Order reasoned that such relief would disturb the status quo. The Third Circuit has defined the status quo as "the last, peaceable, non-contested status of the parties". *KOS Pharmaceuticals, Inc. v. Andrx Corp*., 369 F.3d 700, 708 (3rd Cir. 2004). On July 27, 2021, Colleen Mroz, Supervisor of Special Education for Defendant

communicated to Plaintiff that Defendant was looking forward to seeing C.G. along with George at school. (Email from C. Mroz to P.G. (July 27, 2021), Exh.10). If the status quo is to be maintained in this case, it should be C.G. in school with George because that was the last peaceable, non-contested status of the parties. Moreover, the ADA's reasonable modification requirement imposes an "affirmative obligation" on public entities. *Tennessee v. Lane*, 541 U.S. 509, 533 (2004); *S.K. v. North Allegheny School Dist.*, 146 F. Supp. 3d 700, 714, 717-18 (W.D. Pa. 2015). Although the "affirmative obligation" in *Tennessee v. Lane,* concerned the issue of physical access to court for persons with disabilities, the principle of an affirmative obligation to address issues concerning disability discrimination provides ample warrant for a mandatory injunction even to change the status quo in order to enforce fundamental federal disability laws and regulations and to protect the rights of those with disabilities. In the instant matter, the status quo should be C.G. in the community, accompanied by her service animal. However, assuming *arguendo* that the Court finds that the status quo is otherwise, it should find that the status quo is causing irreparable harm and issue a preliminary injunction to change it.

### E. It Is In the Public Interest That C.G. be Allowed to Attend School With Her Service Animal

The public interest supports the entry of injunctive relief. "In enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities. … This public interest is served by requiring entities to take steps to 'assure equality of opportunity' for people with disabilities." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1167 (9th Cir.) (citation omitted), cert. denied, 565 U.S. 929 (2011); *accord Deck v. City of Toledo*, 29 F. Supp. 2d 431, 434 (N.D. Ohio 1988). The District's actions are in direct conflict with the ADA and §504. The DOJ has promulgated service dog regulations that have the effect of law, and the District's actions are in direct conflict with those regulations. Moreover, the DOJ has actively sought to enforce its regulations in school districts found to be non-compliant ("Justice Department Sues Gates-Chili School District for Violating the Service Animal Requirements of the ADA", DOJ Office of Public Affairs News Release, September 29, 2015; "Hillsboro School District Agrees to Access for Autism Service Dog", DOJ Office of Public Affairs New Release, March 7, 2011; "New Jersey School District to Adopt Service Animal Policies and Pay Fine to Resolve Just Department Investigation", DOJ Office of Public Affairs News Release, June 24, 2014).

There is no clearer expression of the public interest than public law, and no better way to effectuate that interest than by directing the District to immediately allow C.G. to attend school with her service animal.
“People with epilepsy commonly rely on the functional assistance of service dogs to provide care and support and to maintain their independence...” *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 115 fn 1, (3d Cir. 2018) (internal citation omitted). It is in the public interest for C.G. to be given the opportunity to attend school in person as other students do, and not be subject to isolation or segregation because of her need for a service dog.

The denial of Plaintiff’s Motion for Preliminary Injunction could have an *in terrorem* effect on people with disabilities who use service animals. Public and private entities could simply deny a person the right to use their service animal, even in the face of compelling evidence that (1) it is actually a service animal, and (2) the animal is necessary. This will leave persons with disabilities exposed to significant and substantial danger, as they muddle through life without the use of their service animal, or as they attempt to produce copious documentation not required by the ADA and engage in lengthy and expensive litigation to vindicate their rights, with no

prospect of relief for a year or more until a trial on the merits can be conducted.

## VII. BOND SHOULD NOT BE REQUIRED

The Third Circuit has acknowledged that Federal Rule of Civil Procedure 65(c)'s bond requirement may be waived in non-commercial cases based on consideration of: (1) the possible loss to the enjoined party and the hardship that a bond requirement would impose on the applicant, and (2) the special nature of suits to enforce important federal rights. *Temple Univ. v. White*, 941 F.2d 201, 219-20 (3d Cir. 1991), cert. denied, 502 U.S. 1032 (1992). The Defendant will lose nothing if C.G. is allowed to attend school with her service animal. In addition, Plaintiffs seek to enforce important federal civil rights under the ADA and §504. *Cf. Sak v. City of Aurelia*, 832 F. Supp. 2d 1026, 1048 (N.D. Iowa 2011) (imposing de minimis $1 bond in ADA case). Accordingly, bond is appropriately waived in these circumstances.

## VIII. CONCLUSION

Plaintiff is entitled to the use of her service animal at school, under Title II of the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973 (Section 504) and Department of Justice Regulations. Defendant has violated the ADA because Plaintiff is a

qualified individual with a disability, and Defendant is a public entity which has refused to make a reasonable accommodation to allow the service animal to accompany Plaintiff to school. Defendant has violated Section 504 because (a) it receives federal funding, (b) Plaintiff has a disability, (c) Plaintiff is otherwise qualified to participate in school activities; and (d) Plaintiff is being denied the benefit of school activities because of Defendant's refusal to permit Plaintiff's service animal to accompany her, which animal is necessary for Plaintiff's medical and physical safety. Plaintiff's service animal qualifies as a reasonable accommodation based upon the definition of a service animal in 28 C.F.R. §35.104.

In the absence of injunctive relief, the District will force Plaintiff to wait a year or more just to use her service animal as envisioned by the ADA. She will miss all of her 11th grade in-person instruction. Many reasonable people with disabilities can be expected to simply give up in the face of this type of unreasonable obstinance, thus undermining the purpose of the ADA's service dog regulations.

The District's refusal to allow C.G. to use her service animal has already caused irreparable harm, and the longer the District is allowed to maintain its intransigence, the more harm C.G. will suffer. Money damages will not remedy the harm being inflicted upon Plaintiff and are thus

inadequate. For these reasons, the Plaintiff respectfully requests that this Honorable Court grant Plaintiff's Motion for a Preliminary Injunction.

**DISABILITY RIGHTS PENNSYLVANIA**,

Dated: October 12, 2021

By: /s/ Morris A. Scott

Morris A. Scott (PA I.D. 83587)
1800 John F. Kennedy Boulevard,
Suite 900
Philadelphia, PA 19103
(215) 238-8070
mscott@disabilityrightspa.org

*Counsel for Plaintiff*