**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| C.G. *a minor, by and through her Parents,* | : |
| *and next friends*, P.G. *and* D.G. | : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| SAUCON VALLEY SCHOOL | : |
| DISTRICT, | : |
| Defendant. | : |

No. 5:21-cv-03956

_____

**O P I N I O N**
**Plaintiffs' Motion for a Preliminary Injunction, ECF No. 16 – Granted**

**Joseph F. Leeson, Jr.**                                     **November 18, 2021**
**United States District Judge**

### I.      INTRODUCTION

This case is about a minor female, C.G., who wishes to go to school with her service animal by her side. The service animal, a dog, has been trained to perform several special tasks, including the ability to detect rising cortisol levels, which can be a precursor to seizures. C.G., who has been diagnosed with multiple disabilities and has a history of seizures, asked the Saucon Valley School District for permission to attend school with her dog. The District said no.

In response, C.G., through her parents, sued the District, alleging discrimination under the Rehabilitation Act ("RA") and the Americans with Disabilities Act ("ADA").

Since C.G. declines to attend without the dog, she is not currently going to school. Instead, the District provides her with up to five hours of virtual tutoring per week. The District maintains that she is welcome to return to school in person at any time so long as she does not bring the dog with her.

The District acknowledges that C.G. is someone with disabilities. However, it does not believe that the dog mitigates those disabilities and is therefore not a true service animal. C.G. now

1
111621

moves the Court to issue a preliminary injunction ordering the District to allow her to bring the dog to school with her while the parties litigate the issue.

Since the Court determines that C.G. has shown a substantial likelihood of success that the dog is a service animal, that she will suffer irreparable harm if she is not allowed to attend school with the dog, and because the District will suffer no harm by allowing C.G. to attend school with the dog, the Court grants C.G.'s motion for a preliminary injunction allowing her to bring her dog to school.

## II.    FINDINGS OF FACT[1]

*C.G.*

C.G. is a student at a public high school, Saucon Valley High School, which is part of the Saucon Valley School District. *See* Ans. ¶¶ 8, 11, 13, ECF No. 13. She is currently in her junior year. *See id.* C.G. has been diagnosed with numerous disabilities, including intractable complex partial epilepsy, dyspraxia (also known as developmental coordination disorder), and cerebral palsy. *See id.* at ¶¶ 1, 13. In addition to these diagnoses, C.G. also suffers from convergence and divergence disorder, a type of eye impairment, which was worsened by a head injury she sustained during gym class in 2018.[2]  *See* Ex. 3 ¶ 9; Ex. 4 pg. 2.[3]

---

[1]      In addition to admissions contained in the Answer, the findings of fact are based on factual allegations in the Complaint, motions, briefs, exhibits, and testimony given during a preliminary injunction hearing held on November 8, 2021. At the preliminary injunction hearing, counsel for both parties presented argument and had the opportunity to call witnesses. C.G.'s mother, who also serves as C.G.'s home health aide, testified. Janice Wolfe, executive director for Merlin's Kids, also testified on behalf of the Plaintiff. The District did not call any witnesses.

[2]      C.G. has also been diagnosed with acute anxiety, autism, depression, attention deficit hyperactivity disorder, anxiety disorder, chronic migraines, and other specific learning disabilities. *See* Ans. ¶¶ 1, 13.

[3]      C.G. attached fourteen exhibits to her motion for a preliminary injunction, which the parties stipulated to enter into evidence. *See* ECF No. 20. The exhibits are as follows: (Ex. 1) June 2020 letter from Dr. Katherine Mitchell; (Ex. 2) C.G.'s August 2021 Seizure Action Plan; (Ex. 3) Certification of C.G.'s mother; (Ex. 4) September 2021 letter from Dr. Boosara Ratanawongsa; (Ex. 5) August 2021 letter from Dr. Boosara Ratanawongsa; (Ex. 6) C.G.'s Individualized Education Program; (Ex. 7) Neurosensory Center of Eastern Pa. Accommodations form; (Ex. 8) Ancillary

C.G.'s everyday life has been altered because of her disabilities. For example, she has an "uneven gait and poor stamina." Ex. 4 pg. 2. She has trouble "communicating and understanding" the difference between "safe [and] dangerous choices." Ex. 1 pg. 1. She "cannot cross the street without a responsible adult with her." *id.* She also has a history of and continued risk of experiencing seizures. *See* Ex's. 1–6.

A majority of C.G.'s seizures have included symptoms such as staring, confusion, incontinence, lip smacking, repetitive actions, and becoming combative. *See* Ex. 2. p. 1. However, she has also experienced two grand mal seizures, which cause "a loss of consciousness and violent muscle contractions." Compl. ¶ 16, ECF No. 1. Her most recent seizure occurred on January 12, 2020. *See* Ex. 1. p. 1.

Several efforts have been made to curb C.G.'s seizures. For example, she had a portion of the right side of her brain removed. *See* Ans. ¶ 14. She also takes anti-seizure medication twice per day. *See id.* ¶ 18. Despite these medical interventions, however, "she continues to be at a risk for seizures at any time." Ex. 4. p. 2. This continued risk is reflected in the District's Individualized Education Program for C.G. ("IEP"), which incorporates a Seizure Action Plan ("SAP"). *See* Ex's 2, 4.

In the SAP, it states that C.G.'s seizures vary in frequency and severity. *See* Ans. ¶¶ 20–23. It also states that stress, fatigue, and excessive heat can be potential triggers for a seizure. *See id.* Lastly, it provides instructions on what to do should C.G. experience a seizure at school: administer rescue medications (which the school nurse possesses) and contact emergency services. *See id.*

---

Prescription; (Ex. 9) August 2021 letter from Janice Wolfe, executive director of Merlin's Kids; (Ex. 10) July 27, 2021 email to Supervisor of Special Education; (Ex. 11) August 17, 2021 email to Superintendent; (Ex. 12) August 18, 2021 email to Supervisor of Special Education; (Ex. 13) Certification of Lee Wentz, Esq with attached exhibits W1–W7; (Ex. 14) August 2021 letter from physician assistant-certified Amy Pulcini.

*George*

To help C.G. function in her day-to-day life, her doctor recommended that she obtain a service animal. *See* Ex. 8. After several years of saving money, C.G.'s parents applied for a service animal from Merlin's Kids. *See* Mot. 6, ECF No. 16.

Merlin's Kids is a nonprofit organization that has trained more than a thousand dogs to be service animals for those with disabilities. *See id.* 6; Ex. 9. Before someone can receive a dog from Merlin's Kids, he or she must prove to Merlin's Kids that he or she suffers from a disability and that a dog trained to perform certain tasks could mitigate that specific disability. If an applicant is accepted, Merlin's Kids will train a dog specifically for the applicant, teaching the dog to perform tasks related to the applicant's disability.

C.G. met Merlin's Kid's requirements and was paired with George—an American Kennel Club standard poodle. *See* Compl. ¶ 25. In preparation to assist C.G., George received more than 1,500 hours of training and "9 months of public access exposure." Ex. 9. In addition to training George, Merlin's Kids also trained C.G. and her parents on how to handle George. *See id.* This included a twelve-week course where C.G. and her parents participated in more than forty hours of hands-on training with George. *See id.* Merlin's Kid's executive director, Janice Wolfe, personally observed C.G. handle George on several occasions, each time without incident. As a result of this training, Merlin's Kids certified George as a "task trained service dog" and C.G. as a "certified handler." *Id.* In all, George is trained to perform six tasks. *See id.*

First, George has been trained to perform mobility assistance for C.G. *See id.* To accomplish this task, George wears a harness, which C.G. may hold on to. Using this harness, George can pull C.G. forward while she walks, which lowers the pressure she experiences in her back leg. George also guides C.G. in a straight line while walking and helps her maneuver around objects or people when needed. George can also act as an anchor for C.G. if she feels dizzy, keeping her from falling.

In addition, George will not approach other individuals while he is with C.G. because the movement could cause her to lose her balance. All of this has provided C.G. with increased mobility. According to C.G.'s doctor, she has "more endurance to walk longer distances with less fatigue" because of George's assistance. Ex. 4, p. 1.

Second, George has been trained to perform Deep Pressure Therapy ("DPT") for C.G. *See* Ex. 9. DPT involves George placing his paws or body directly on C.G. when she is experiencing increased anxiety, a rise in cortisol levels, or is otherwise unwell. Depending on the scenario, and on whether C.G. is sitting or lying, George will lay on C.G.'s lap, chest, or across her hips. The pressure and heat from George's body calms and soothes C.G. until she returns to a stable condition.

Third, George has been trained to mitigate C.G.'s anxiety. *See* Ex. 9. According to Janice Wolfe, George accomplishes this task by using a combination of his other skills.

Fourth, George has been trained to detect when C.G.'s cortisol levels fluctuate. *See id.* Rising cortisol levels can be an early warning sign of an anxiety attack or even a seizure. *See id.* Depending on the rate of change in C.G.'s cortisol levels, George can determine whether she may be experiencing anxiety, having an anxiety attack, or is at risk of a seizure.

Fifth, George has been trained in seizure response. *See id.* If George detects that C.G.'s cortisol levels indicate a possible anxiety attack or seizure, he will push her into a seated or lying position to prevent her from injuring herself. Depending on the situation, he may also perform DPT.

Sixth, George has been trained to provide additional medical alert and response for C.G. *See id.* Should C.G. require medical attention, George will alert a nearby person to the situation. To do this, George will leave C.G.'s side to get the attention of another individual and then lead them to C.G., continuing in these efforts until help arrives. George demonstrated some of these tasks on September 12, 2021, during a family shopping trip. *See* Ex. 4, p. 2.

While shopping at a local Home Depot with her parents, C.G. "developed a severe migraine." *Id.* Her condition went unnoticed by her parents. *See id.* George, however, pushed "and nudged her to sit down." *Id.* George then started performing DPT on C.G. *Id.* Her parents then noticed that she "looked pale and just unwell." *Id.* George continued to perform DPT for approximately forty minutes before C.G.'s parents returned her to the car and gave her food and drink. *See id.*

With George's help, C.G. "has become more confident, more independent, and able to do a lot more things for herself." *Id.* According to C.G.'s seizure doctor, she would "benefit" from having a trained service dog accompany her to school. *See* Ex. 5. Her physician from St. Luke's Psychiatric Associates concurs that "it is clinically recommended that accommodations be made so that [C.G.] may have her therapeutic service dog accompany her to school." Ex. 14.

### C.G.'s requests to the District

C.G.'s mother first mentioned George to the District in the spring of 2021 during an IEP team meeting. Ans. ¶ 34. She then brought C.G. and George to an IEP team meeting held in July 2021. *Id.* ¶ 35. At the meeting, C.G.'s mother requested that the District allow C.G. to attend school with George. Comp. ¶ 37. At the same meeting, C.G. also demonstrated her ability to handle George for members of the District who were present, and the members praised C.G. "for her work with [George]." *Id.* ¶ 36.

Several days after the July meeting, the District's Supervisor of Special Education sent C.G.'s mother an email regarding George. *See* Ex. 10. In the email, the Supervisor requested proof of George's certification as a service animal and proof of C.G.'s certification as George's handler. *See id.* The Supervisor also asked for someone's contact information at Merlin's Kids. *See id.* The Supervisor explained to C.G.'s mother that before George would be permitted to attend school with C.G., the District would need proof that George could go the entire school day without needing to

relieve himself or eat. *See id.* Nevertheless, the Supervisor assured C.G.'s mother that once the District received the requested certifications the Supervisor would "send appropriate communication to classroom peers to prepare for [C.G.'s] therapy dog." *Id.* Finally, the email closed by stating "[w]e are looking forward to a fabulous year and are so happy to see [C.G.] back in school with George along her side!" *Id.*

In response to the Supervisor's requests, C.G.'s mother emailed the District's Superintendent on August 17, 2021. *See* Ex. 11. She stated that C.G. "is a qualified individual with a disability and has a service dog." *See id.* She further stated that George "provides [C.G.] with cortisol detection and alert, deep pressure therapy, mitigation of anxiety, and mobility assistance." *Id.* She also attached records of George's rabies vaccination and provided contact information for Merlin's Kid's executive director, Janice Wolfe. *See id.* The next day, C.G's mother forwarded an email to the Supervisor. *See* Ex. 12.

The forwarded email was in reference to George's work with C.G. *See id.* Specifically, the forwarded email outlines several of the tasks George had been trained to perform: "[h]e has been able to alert her when cortisol levels change;" "[h]e is trained to perform deep pressure therapy;" and George "has provided mobility support and assistance." *See id.* The forwarded email also highlights C.G.'s improvements with George: "she has become more aware of accessing her coping and intervention tools;" she "has demonstrated a decrease in the length and severity of her anxiety;" she has "shown improvement in her social topics;" and she "has increased [her] overall stamina physically." *Id.*

On August 20, 2021, C.G.'s mother spoke with the Superintendent and again asked that C.G. be allowed to attend school with George. *See* Ans. ¶ 43. The Superintendent assured her that someone from the District would contact her about George before school started the next Monday.

*See id.* With school fast approaching, and no definite answer from the District, C.G.'s parents involved counsel in the matter.

Counsel for C.G. emailed the Superintendent, "describing the service dog requirements of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act and asked that [C.G.] be granted an accommodation and allowed to attend school with [George]." Ex. 13, ¶ 4.

The District responded to this email, stating "the Parent in this matter has provided several different explanations as to what task the service animal will do and for what condition this task is related." Ex. W2. In addition, the District explained that its "understanding is that while [C.G.] had seizures in the past, the case of which was corrected by surgery, and [C.G.] has not been treated for seizures or had seizures for many years." *Id.* For these reasons, "the District will not agree to permit the service animal in the school building until this issue can be resolved." *Id.* After several more email exchanges, the District reiterated that "the District is denying the request to permit [C.G.] to bring [George] to school because [he] does not qualify as a service animal." Ex. W6.

The school year started, and C.G. chose not to attend classes in person because she did not feel safe without George. Ans. ¶ 3. As a result, the District held an IEP meeting for C.G. on September 16, 2021. *See* Mroz Cert., Resp. Ex. 1. At the meeting, the District offered to provide C.G. with "a full virtual option for school" and reminded C.G.'s parents that C.G. could attend school in person so long as she did so without George. *See id.* C.G.'s parents denied both options, refusing "to consider any in-person option for educating [C.G.] unless [she] was able to bring [George] to school with her." *Id.* ¶ 3. Eventually, the District and C.G.'s parents agreed that C.G. would receive "homebound instruction in the form of up to five hours of tutoring per week to be provided virtually" for the time being. *Id.* ¶ 6.

C.G.'s condition has deteriorated since the District denied her requests to attend school with George. Her migraines have increased; her stress "has been high;" "her general mood has

decreased;" she has had increased anxiety and panic attacks; and "she is not engaging in activities with interest as before." *See* Ex. 4.

### III.    PROCEDURAL BACKGROUND

C.G. filed a complaint with the Court alleging that the District discriminated against her and violated the RA and the ADA by denying her request to attend school with George. *See* Compl. The District filed an Answer with the Court in response. *See* Ans. Along with the Complaint, C.G. filed a motion for a temporary restraining order, seeking to enjoin the District from prohibiting her to attend school with George. *See* ECF No. 3. The Court denied that motion. *See* ECF No. 11.

C.G. now moves the Court to issue a preliminary injunction that would order the District to allow her to attend school with George while the case is litigated. *See* Mot. The District filed a response to the Motion, asserting two reasons why the Court should deny the Motion. *See* Resp., ECF No. 17. First, the District argues that C.G. has not shown she is likely to succeed on the merits of her case because George does not qualify as a service animal. *See id.* 4. Second, the District argues that C.G. has not shown she will suffer irreparable harm if the Motion is denied. *See id.* 8. C.G. then filed a Reply to the Response. *See* Rep., ECF No. 18. Lastly, the Court held a hearing on the Motion, during which the parties made argument and had the opportunity to present evidence and call witnesses. *See* ECF No. 19.

### IV.    LEGAL STANDARD Preliminary Injunction — Review of Applicable Law

There are two types of preliminary injunctions: prohibitory and mandatory. A prohibitory injunction, the more common type, maintains "the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cty.,* 40 F.3d 645, 647 (3d Cir. 1994). In contrast, a mandatory injunction "alter[s] the status quo by commanding some positive action or provid[ing] the moving party with substantially all the relief sought and that relief cannot be undone even if the defendant

prevails at a trial on the merits." *Pub. Int. Legal Found. v. Boockvar*, 495 F. Supp. 3d 354, 358 (M.D. Pa. 2020) (cleaned up).

To prevail on a motion for either type of preliminary injunction, the moving party must meet four factors: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm without the injunction; (3) that the "balance of equities" weighs in the moving party's favor; and (4) that the public interest favors the injunction. *See Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)). However, the moving party's burden of proof varies depending on which type of preliminary injunction is sought, prohibitory or mandatory.

For a prohibitory injunction, the moving party must show that his or her likelihood of success on the merits are "significantly better than negligible but not necessarily more likely than not." *Reilly v. City of Harrisburg*, 858 F. 3d 173, 179 (3d Cir. 2017). The burden for a mandatory injunction is higher. For a mandatory injunction, the moving party must show "a substantial likelihood of success on the merits and that their right to relief is indisputably clear." *Dunmore Sch. Dist. v. Pennsylvania Interscholastic Athletic Ass'n*, 505 F. Supp. 3d 447, 457 (M.D. Pa. 2020) (citing *Hope v. Warden York Cnty. Prison*, 972 F. 3d 310, 320 (3d Cir. 2020)). For both types of injunctions, "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while supporting some preliminary relief." *Reilly*, 858 F. 3d at 179 (quoting *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)).

"In deciding a motion for a preliminary injunction, the district court has broad discretion." *Karsevar v. Southland Corp.*, No. CIV.A. 87-672, 1987 WL 6693, at *4 (E.D. Pa. Feb. 12, 1987). Ultimately, a "court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in the particular case." *United States v. Price*, 688 F.2d 204, 211 (3d Cir. 1982).

## V.     CONCLUSIONS OF LAW

C.G. argues that this Court should issue a preliminary injunction ordering the District to allow her to attend school with George because she satisfies all four factors required for such relief. *See generally* Mot. Before the Court addresses each factor, however, it must first determine whether the relief C.G. requests constitutes a prohibitory or mandatory injunction because, depending on the answer, C.G.'s burden will vary.

C.G. asserts that the relief requested constitutes a prohibitory injunction because the status quo, at least for her, is that she takes George with her wherever she goes. *See id.* 39. However, the status quo is "the last peaceable, non-contested status [between] the parties." *See KOS Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F. 3d 700, 708 (3d Cir. 2004) (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir.1990)). And the last non-contested status between the parties was C.G. attending school without George.

C.G. was recently paired with George, so she has never brought him to school before. Indeed, the District has never allowed her to bring George to school. Ordering the District to permit George's presence would require the District to take a positive action, which would alter the status quo between the parties. In addition, granting the preliminary injunction would provide C.G. with the exact relief she seeks in the Complaint. For these reasons, the Court determines that C.G.'s Motion requests a mandatory injunction. Having determined this, the Court will now address each of the four factors required for a preliminary injunction.

### 1.     C.G. has shown a substantial likelihood that she will succeed on the merits.

Since C.G. seeks a mandatory injunction, she must show "a substantial likelihood of success on the merits and that [her] right to relief is indisputably clear." *Dunmore*, 505 F. Supp. 3d at 457 (citing *Hope*, 972 F. 3d at 320). To meet this burden, C.G. must show a substantial likelihood that the District discriminated against her under the RA and the ADA by refusing her request to attend

school with George. Thus, the Court first reviews the RA and the ADA and then discusses whether C.G. has met her burden, concluding that she has.

### a.   *C.G.'s claims under the RA and the ADA*

Both the RA and the ADA "secure the rights of individuals with disabilities to independence and full inclusion in American society." *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 109–10 (3d Cir. 2018). For those with disabilities, "[t]he RA assures 'meaningful access' to federally funded programs," *id.* at 110 (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)), "and the ADA provides for 'full and equal enjoyment' of public accommodations." *Berardelli*, 900 F. 3d at 100 (citing 42 U.S.C. § 12182(a)). Since the RA and the ADA both "aim to root out disability-based discrimination," they are often applied and analyzed coextensively by courts. *See Fry v. Napoleon Cmty. Sch.*, 137 S.Ct. 743, 756 (2017) (explaining that the statutes overlap in coverage and the "same conduct might violate" both).

For example, both require that reasonable accommodations or modifications be made by covered actors for individuals with disabilities. *See Berardelli*, 900 F. 3d at 110. "[T]hey impose the same substantive liability standard and require a unified approach to the 'reasonableness' of accommodations and modifications." *Id.* at 117. In the context of service animals, "it constitutes discrimination under the RA, to the same extent as under the ADA, to refuse to permit disabled individuals to be accompanied by service animals." *Id.* at 114. And "a disabled individual's proposed accommodation of the use of her service animal is reasonable under the ADA as a matter of law." *Id.* at 119 (citing *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1064 (5th Cir. 1997)). A covered actor therefore violates both statutes per se if it denies a disabled person's request to be accompanied by his or her service animal unless one of four exceptions apply: (i) granting access would fundamentally alter the nature of the program; (ii) the animal poses a direct

threat to the health or safety of others; (iii) the animal is out of control; or (iv) the animal is not housebroken. *See* 28 C.F.R. §§ 35.130(b)(7)(i), 35.136(b)(1)–(2), 35.139, 36.302.

In this case, the District concedes that it is a public entity that receives federal funding and is covered by both statutes. *See* Ans. ¶¶ 54, 60. It also concedes that C.G. is a person with disabilities protected under both statutes. *See id.* ¶¶ 51, 59. Moreover, the District concedes that C.G. requested to attend school with George, and that the District denied that request. *See id.* ¶¶ 2,3. Finally, the District does not contend that any of the four exceptions apply to George that would allow it to deny his presence at school. Thus, C.G.'s likelihood of success on the merits of her claims under both statutes hinges on a single question: whether George qualifies as a service animal. To prevail, C.G. must show a substantial likelihood that George qualifies as a service animal because, if he does, C.G.'s request is reasonable per se, and the District has therefore violated both statutes.

Whether an animal qualifies as a service animal is a two-part test. First, the animal must be "individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability." 28 C.F.R. § 35.14. Second, the tasks performed by the animal "must be directly related to the individual's disability." *Id.* Examples of qualifying tasks include "assisting an individual during a seizure" and "providing physical support and assistance with balance and stability to individuals with mobility disabilities." *Id.*

In contrast, animals that merely provide emotional support, comfort, or companionship do not qualify as service animals. *See id.* In other words, "[a]n animal that simply provides comfort or reassurance is equivalent to a household pet, and does not qualify as a service animal under the ADA." *Rose v. Springfield-Greene County Health Dept.*, 668 F. Supp. 2d 1206, 1215 (W.D. Mo. 2009) (citing *Baugher v. City of Ellensburg, Wash.*, No. CV–06–3026–RHW, 2007 WL 858627, at *5 (E.D. Wash. Mar. 19, 2007)).

If an individual requests to be accompanied by his or her service animal, a public entity "may make two inquiries to determine whether [the] animal qualifies as a service animal." 28 C.F.R. § 35.136(f). It "may ask if the animal is required because of a disability and what work or task the animal has been trained to perform." *Id.* Once these two questions have been answered, the investigation must end; "it shall not ask about the nature or extent of a person's disability" and "shall not require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal." *Id.*

C.G. asserts that George qualifies as a service animal because of the tasks he has been trained to perform to mitigate her disabilities. *See* Mot. 27–34. She also asserts that the District's inquiry into whether George qualifies as a service animal went beyond what is permitted by law. *See id.* 31–32. The District, however, contends that George does not qualify as a service animal and that its inquiry was reasonable considering the information it was privy to regarding C.G. by way of her IEP. *See* Resp. 5. Specifically, the District makes three arguments as to why George does not qualify as a service animal. *See id.* 5–7.

First, the District argues that the "majority of the purported tasks that the dog will perform are clearly of the nature of emotional support, well-being, comfort of companionship, which by the terms of the regulations takes it out of the arena of being a service animal." *Id.* 5. According to the District, "cortisol detection and alert, deep pressure therapy, and mitigation of anxiety all fall within" the category of emotional support. *Id.* The Court disagrees.

The ability to detect changes in cortisol levels, and then to respond to such changes, is not something that an ordinary pet can do. *See  e.g., Riley v. Bd. of Comm'rs of Tippecanoe Cty.*, No. 4:14-CV-063-JD, 2016 WL 90770, at *2 (N.D. Ind. Jan. 6, 2016) (explaining that a service animal "must simply be trained to perform tasks for the benefit of a disabled individual in a manner that sets it apart from an ordinary pet"); *Storms v. Fred Meyer Stores, Inc.*, 120 P.3d 126, 129 (Wash.

Ct. App. 2005) (explaining that a service dog has training that sets it "apart from the ordinary pet");

*Rose*, 668 F. Supp. at 1215 (explaining that an animal that is "equivalent to a household pet" is not a

service animal). Rising cortisol levels can be the precursor to something more serious, like a

seizure. George's ability to detect this and to put C.G. and other nearby individuals on notice of

such an event could prevent serious injury and could potentially be life-saving. This goes well

beyond merely providing C.G. with comfort and companionship.

DPT is another task that an ordinary pet could not do. Depending on how C.G. is feeling,

and on how her body is positioned, George will strategically place his own body directly on C.G.,

allowing the pressure and warmth from his body to have a positive effect on C.G.'s current

condition; a dog without training would not be able to do the same thing. George's ability to

perform DPT therefore provides more to C.G. than simple companionship.

George's ability to mitigate C.G.'s anxiety, while admittedly a closer call, also elevates

George above a mere emotional support animal. Several of C.G.'s disabilities are psychiatric in

nature, and George's training enables him to mitigate these. The fact that this phenomenon is more

difficult to see or that it relates to a psychiatric ailment opposed to a physical one, does not make it

any less real; the ADA applies to service animals that mitigate psychiatric disabilities just as much

as to those that mitigate physical disabilities. *See e.g.,* 28 C.F.R. § 35.14 (explaining a service

animal may be "trained to do work or perform tasks for the benefit of an individual with a disability,

including . . . psychiatric, intellectual, or other mental disability"); *Bhogaita v. Altamonte Heights*

*Condo. Ass'n, Inc.*, 765 F.3d 1277, 1289 (11th Cir. 2014) (concluding that a reasonable factfinder

could conclude that the complainant's dog alleviates the symptoms of his post-traumatic stress

disorder); *Castellano v. Access Premier Realty, Inc.*, No. 1:15–CV–0407–MCE–KJS, 2016 WL

1588430, at *6 (E.D. Cal. Apr. 20, 2016) (concluding that the complainant's cat was necessary to

alleviate the complainant's *mental* and physical ailments, based on a letter from the complainant's

physician); *Smith v. Powdrill*, No. CV 12-06388 DDP RZX, 2013 WL 5786586, at *6 (C.D. Cal. Oct. 28, 2013) (holding that a letter from the complainant's psychiatrist established a nexus between the complainant's *mental* disability and a comfort dog); *The Sec'y, United States Dep't of Hous. & Urban Dev., on Behalf of Durand Evan, Charging Party, Durand Evan, Intervenor*, HUDALJ 09–93–1753–8, 1996 WL 657690, at *6 (Nov. 12, 1996) (finding that a complainant established that waiver of a defendant's no-pet policy was necessary based on letters from a physician and a licensed clinical social worker attesting to the *therapeutic* benefit of the complainant's cat).

This is not an ordinary case of someone struggling with normal anxiety. Instead, C.G. has been diagnosed with anxiety disorder, something more severe than the typical anxiety that everyone experiences from time to time. Neither is this an ordinary case of someone being comforted by a pet's companionship, something anyone who has ever had a pet has experienced. George's training and skills allow him to mitigate C.G.'s anxiety to a much greater extent than an ordinary pet could.

Even if the Court agreed with the District that this particular task fell into the emotional support category, George's other tasks are classic examples of tasks performed by legitimate service animals, not emotional support animals. For these reasons, the Court determines that C.G. has shown a substantial likelihood that George is more than a mere emotional support animal.

The District's second argument is that George's task of providing mobility assistance is unrelated to C.G.'s disabilities. *See* Resp. 6. The District alleges that none of C.G.'s disabilities "lead to a need for mobility assistance" and that "it is unclear how the dog" provides mobility assistance. *Id.* The Court disagrees.

C.G. has provided ample evidence that her disabilities lead to a need for mobility assistance. For example, a letter from Dr. Mitchell states that C.G. "cannot cross the street without" assistance. Ex. 1. A letter from Dr. Ratanawongsa states that C.G. "does not have the stamina to walk longer distances" and that her "spastic diplegic cerebral palsy and dyspraxia have resulted in an uneven

gait and poor stamina." Ex. 4. C.G.'s mother and home health aide stated that "vision problems make it difficult for C.G.'s eyes to track a straight line and make it difficult for her to walk in a straight line." Ex. 3 ¶ 9. In addition, Janice Wolfe testified at length as to how George provides mobility assistance to C.G. *See supra* sec. II, *George*. For these reasons the Court determines that C.G. has shown a substantial likelihood that she needs mobility assistance because of her disabilities and that George performs tasks directly related to those needs.

The District's third argument is that George's ability to detect and alert for seizures is unrelated to C.G.'s disabilities because "the District is unaware of the Student having ongoing issues related to seizures for many years." Resp. 7. In other words, the District argues that C.G. does not need George for seizure detection because C.G. does not have "an actual active medical condition." *Id.* However, this is in direct conflict with C.G.'s own seizure doctor who opines that C.G. "continues to be at a risk for seizures at any time." Ex. 4. pg. 2. The District's current IEP, which includes the SAP, and the fact that C.G. takes seizure medication twice per day, supports that C.G.'s intractable complex partial epilepsy is an active medical condition. For these reasons, the Court determines that C.G. has shown a substantial likelihood that George's ability to detect and alert to seizures is directly related to at least one of her disabilities.

As an aside, although the burden to prove a substantial likelihood on the merits is on C.G., the Court notes that the District did not support its arguments with any evidence or testimony. Moreover, the above reasoning supports the ADA's limitation on how far a public entity may probe when faced with a request to make an accommodation for a service animal.

The District argues that its prior knowledge of C.G.'s medical history justifies its additional inquiries beyond what would normally be allowed by another public entity. It is true that under some circumstances a public entity may request additional, appropriate information to verify a service animal so long as the additional inquiry is not being used to harass or discourage the

individual with disabilities "from availing themselves of public accommodation." *Dilorenzo v.*
*Costco Wholesale Corp.*, 515 F. Supp. 2d 1187, 1194 (W.D. Wash. 2007); *see also Prindable v.*
*Ass'n of Apartment Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245, 1260 (D. Haw. 2003), *aff'd*
*sub nom. Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175 (9th Cir. 2006).
However, the District's unique knowledge of C.G.'s medical history, which would normally not be
known by another public entity, does not justify a more thorough investigation than normal. If
anything, the opposite is true. The District already knew that C.G. had been diagnosed with several
disabilities, which is why it has an active IEP for her. Requesting additional certification and
fixating over the frequency of C.G.'s seizures go against the ADA's "sweeping purpose." *See PGA*
*Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001).

In sum, C.G. has shown a substantial likelihood of success on the merits because there is a
substantial likelihood that George qualifies as a service animal because he has been trained to
perform tasks that relate to one or more of C.G.'s disabilities.

## 2. C.G. will suffer irreparable harm if the preliminary injunction is denied.

Irreparable harm is "potential harm which cannot be redressed by a legal or equitable
remedy following a trial." *Campbell Soup Co. v. Conagra, Inc.*, 977 F. 2d 86, 91 (3d Cir. 1992). In
other words, irreparable harm is something that cannot be fixed by cashing a check. Pertinent to this
case, "[c]ompensation in money can never atone for deprivation of a meaningful education in an
appropriate manner at the appropriate time." *John T. ex rel. Paul T. v. Com. of Pa.*, No. CIV. A. 98-
5781, 2000 WL 558582, at *8 (E.D. Pa. May 8, 2000). Even when alternative methods of education
are available to a plaintiff, irreparable harm still exists if the plaintiff cannot make meaningful
progress using the alternative methods. *See id.* (finding irreparable harm where a student was denied
enrollment at a particular school even though the student had the option of attending a different
school because the student could only make "meaningful progress" at the first).

C.G. asserts that she will suffer irreparable harm if her Motion is denied because the District "is denying her an adequate education." Mot. 19. Without George, she argues, she cannot "fully participate in school and enjoy the benefits of [the District's] program." *Id.* 22. According to C.G., not only does her absence from school "have a determinantal and irreversible effect upon [her] . . . intended progress toward graduation . . . and advancement to post-secondary education," it also "segregate[s] her from her peers." *Id.*

The District, on the other hand, contends that C.G. has not shown irreparable harm because any harm she does suffer is self-inflicted. Resp. 8. The District points out that it has offered to provide a fully virtual education for C.G. *Id.* It also points out that C.G. is welcome to attend school in person so long as she does not bring George with her. *Id.* Lastly, the District highlights the fact that C.G. attended school for many years without George, arguing that she could do the same now. *Id.*

Any "choice" that C.G. has to attend school without George is illusory. Yes, C.G. could attend school without George but only by putting herself at risk of harm. The District attempts to supplant the advice of C.G.'s own physician, who opines that she is at continued risk of a seizure, with its own opinion that C.G.'s risk of having a seizure is low because it has been some time since her last seizure. "That may be. But refusing Plaintiff's requested accommodation if it is reasonable in favor of one the School Board prefers is akin to allowing a public entity to dictate the type of services a disabled person needs in contravention of that person's own decisions regarding his own life and care." *Alboniga v. Sch. Bd. of Broward Cty. Fla.*, 87 F. Supp. 3d 1319, 1341 (S.D. Fla. 2015). Forcing C.G. to put her health in jeopardy to attend school without George falls short of being an acceptable alternative. *See Berardelli*, 900 F.3d at 125 (finding that "assistance of school staff alone and in the absence of [plaintiff's service dog's] therapeutic services, [plaintiff] was subjected to additional safety risks," which was not a reasonable accommodation).

The Court does not find the fact that C.G. attended school without George to be persuasive because it was *before* C.G. and George had been paired; since being paired, George has not left C.G.'s side. The Court also notes that C.G's history of attending school without George does not paint the picture that she can do so safely. Indeed, C.G. suffered a severe head injury in 2018, resulting in brain damage, while she was at school without George.

In addition, the District's argument that C.G.'s harm is self-inflicted because she declined a completely virtual education is reminiscent of a similar argument made long ago, which the Supreme Court rejected—segregating children from their peers in an educational setting is acceptable if they receive equal educational opportunities. *See generally Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan*., 347 U.S. 483 (1954), *supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955). It matters not whether the District's offer of a virtual education includes the same syllabi, courses, and other comparable factors that would be provided in person. If the District offers the opportunity of receiving an education in person, that same "right must be made available to all on equal terms," including C.G. *See id.* at 493. This means C.G. must have the option to attend school in person with her peers where she has the chance to make meaningful progress.

If the Court were to accept the District's logic that C.G. will not suffer irreparable harm because she could either attend school without George or take virtual courses, then no person suffering from a disability could ever prove irreparable harm by being turned away from a public entity if the entity offered access without the service animal or a virtual comparison. This would subvert the very purpose of the RA and the ADA, which "recognizes that disabilities do not diminish the right to full inclusion in American society." *Berardelli*, 900 F.3d at 116.

For the reasons above, and because "the Court is unwilling to gamble with a child's education," *N.J. v. New York*, 872 F. Supp. 2d 204, 214 (E.D. NY 2011), the Court determines that

C.G. has met her burden under the second factor. C.G. has a right to an equal education to that of her peers and will suffer irreparable harm if she is denied in person attendance with George because attending without George puts her health at risk and because other alternatives deny her the chance of making "meaningful progress" in her education. *See John T. ex rel. Paul T.*, No. CIV. A. 98-5781, 2000 WL 558582, at \*8 (finding that the plaintiff would suffer irreparable harm absent an injunction ordering attendance at a certain school because it was the only school where he could achieve meaningful progress).

3. **The balance of equities weighs in favor of granting the preliminary injunction.**

The third factor requires that the Court balance the benefit that C.G. would receive with the issuance of a preliminary injunction with the harm it would cause to the District. The benefits to C.G. are apparent, primarily that she would continue in person education during very formative years under George's watchful protection. Any harm that the District might suffer, however, is anything but apparent. Indeed, the District does not put forward a single reason of how it would be harmed if George attends school with C.G. or what burden George's presence would cause. In the absence of any harm caused to the District, the Court determines that the balance of equities weighs in favor of granting C.G.'s request for a preliminary injunction.

4. **Public interest favors the granting of the preliminary injunction.**

"As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *American Tel. and Tel. Co. v. Winback and Conserve, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). Since C.G. has demonstrated a likelihood of success on the merits and that she will suffer irreparable harm if kept from attending school with George, the public interest weighs in favor of granting her motion for a preliminary injunction. *See Issa v. Sch. Dist. of Lancaster*, No. CV 16-3881, 2016 WL 4493202, at \*8 (E.D. Pa. Aug. 26, 2016), *aff'd and remanded*, 847 F.3d 121

(3d Cir. 2017) (holding that the "public interest clearly weighs in favor of granting a preliminary

injunction to ensure the plaintiffs immediate enrollment in [school] and access to the meaningful

education to which they are legally entitled").

## VI.    CONCLUSION[4]

For the reasons given in this Opinion, C.G.'s motion for a preliminary injunction ordering

the District to allow her to attend school with George is granted.[5]

A separate order follows.


BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

---

[4]    The Court reminds the parties that the findings and conclusions in this Opinion "are by
nature preliminary and therefore are not binding" in the future. *See Parkell v. Senato*, 639 F. App'x
115, 117 (3d Cir. 2016).
[5]    Since this is a non-commercial case where C.G. seeks to enforce important federal rights
and the District will suffer no hardship with the grant of the requested preliminary injunction, the
bond requirement is waived. *See Temple Univ. v. White*, 941 F.2d 201, 219–20 (3d Cir. 1991)
(citing *Crowley v. Local No. 82, Furniture & Piano*, 679 F.2d 978 (1st Cir.1982), *rev'd on other
grounds*, 467 U.S. 526, 104 S.Ct. 2557 (1984)).